# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>JURY DEMAND<br><br>Judge Waverly D. Crenshaw, Jr.<br><br>This Document Relates to:<br>ALL CASES |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENTS AND FOR APPOINTMENT OF SETTLEMENT CLASS REPRESENTATIVES, SETTLEMENT CLASS COUNSEL, AND SETTLEMENT ADMINISTRATOR

This nationwide antitrust class action alleges that Defendant RealPage, Inc., along with owners and managers of large-scale multifamily residential apartment buildings, engaged in a price-fixing conspiracy to artificially inflate rental prices by using RealPage's revenue management software ("RMS"). The alleged conspiracy involves the systematic sharing of confidential, non-public information, including lease transaction, pricing, and occupancy data among competitors, which RealPage then used to generate pricing recommendations that coordinated rental rates above competitive market levels.

To date, Plaintiffs Jason Goldman, Jeffrey Weaver, Billie Jo White, Brandon Watters, Priscilla Parker, Patrick Parker, Barry Amar-Hoover, Joshua Kabisch, Meghan Cherry, and Maya Haynes ("Plaintiffs") have engaged in nearly three years of hard-fought litigation, extensive discovery (yielding document productions of over 14 million documents and 24 terabytes of structured data), and protracted arms-length negotiations facilitated by Court-appointed mediators. After (and because of) those efforts, Plaintiffs have reached 26 settlements totaling $141,800,000 with 27 Settling Defendants.[1] These settlements represent a significant recovery for the Settlement Class. They also provide important non-monetary relief that will fundamentally change how these defendants participate in the multifamily housing market. Settling Defendants have agreed not to provide nonpublic data to RealPage for use in competitor pricing recommendations and to refrain from using RealPage's RMS that relies on non-public competitor data to make pricing recommendations.[2] They have also agreed to provide depositions, document authentication, and trial testimony as the case proceeds. And Settling Defendants, with limited exceptions, have agreed

---

[1] One Settlement included two Defendants: WinnCompanies LLC and WinnResidential Manager Corp.

[2] For certain Settling Defendants, the individual settlement obligates them to make efforts to alter contract terms with RealPage to achieve these limitations.

to waive any right to enforce arbitration clauses, class action waivers, and jury trial waivers as to the claims at issue.

Plaintiffs seek preliminary approval of these settlements under Rule 23(e) and request that the Court conditionally certify a Settlement Class, appoint Plaintiffs as Settlement Class Representatives, appoint Interim Co-Lead Counsel as Settlement Class Counsel, and approve Angeion Group, LLC as Settlement Administrator. Given this case's complexity and the need to coordinate with potential future settlements, Plaintiffs also ask that the Court defer formal notice to the Settlement Class until a comprehensive notice plan and plan of allocation can be presented.

The accompanying Joint Declaration of Interim Co-Lead Counsel in Support of Preliminary Approval attaches a summary of monetary and non-monetary settlement terms as Exhibit A and copies of the agreements as A-1 through A-26. The settlements meet the Rule 23(e)(2) requirements for preliminary approval. They are the product of arm's-length negotiations with the assistance of experienced Court-appointed mediators, provide adequate relief considering the risks and costs of continued litigation, and treat all class members equitably. The Settlement Class meets all the Rule 23(a) and 23(b)(3) elements. There are millions of potential class members, common questions of law and fact about the alleged conspiracy, typical claims among class representatives and absent class members, and adequate representation by qualified counsel.

Plaintiffs respectfully request that the Court grant preliminary approval of the settlements and enter the accompanying [Proposed] Preliminary Approval Order. Plaintiffs' Motion and this Memorandum are further supported by the Joint Declaration of Interim Co-Lead Counsel ("Counsel Decl."); Declaration of Steven Weisbrot of Angeion Group Regarding Angeion Group Qualifications & The Preliminary Notice Plan ("Admin. Decl."); and Declaration of Layn R. Phillips in Support of Plaintiffs' Motion for Preliminary Approval ("Mediator Decl.").

## I. BACKGROUND

### A. Plaintiffs' Allegations

Plaintiffs, on behalf of themselves and others similarly situated, brought this class action lawsuit alleging that Defendant RealPage, along with owners and managers of large-scale, multifamily residential apartment buildings ("Property Defendants") that used RealPage RMS, engaged in a nationwide price-fixing conspiracy to artificially inflate the price of multifamily rental leases in properties participating in RealPage RMS. (Second Consolidated Amended Class Action Complaint ("Compl.") ¶ 2, Dkt. 530.) Plaintiffs allege that RealPage RMS collects real-time, confidential pricing and occupancy information from RealPage customers and uses this private data to generate rental pricing recommendations for class member leases designed to maximize revenue for RMS users. (*Id.* ¶¶ 13-14.) Plaintiffs allege that Property Defendants, who purchase RMS, knowingly share their confidential data with RealPage, understanding that it will be used to help both themselves and their competitors to set prices and control supply. (*Id.* ¶¶ 6, 10-13, 17, 223, 287-99.)[3] Plaintiffs allege that Property Defendants share this information to gain access to the proprietary data that their competitors are similarly providing to RealPage. (*Id.* ¶¶ 6, 10-13, 17, 223, 287-99.) Plaintiffs allege that, by using RealPage RMS, Defendants coordinate on pricing to drive rental prices higher than what would result in a truly competitive market without such coordination. (*Id.* ¶¶ 2, 3, 37, 251, 291, 293, 349, 350, 382.)

### B. Procedural History

This litigation began in October 2022, when the first complaint was filed. On April 10, 2023, the JPML consolidated and transferred 21 pending cases to this Court. (Dkt. 1.) Plaintiffs filed a Consolidated Amended Complaint on June 16, 2023 and a First Amended Consolidated

---

[3] These allegations were withdrawn as to Defendant AIR.

Class Action Complaint on July 5, 2023. (Dkt. 291, 314.) The parties briefed an initial round of motions to dismiss in July 2023. On August 7, 2023, the Court vacated the briefing and ordered Plaintiffs to file a Second Amended Consolidated Class Action Complaint by September 7, 2023, which they did. (Dkt. 495, 530.) In the interim, Plaintiffs dismissed several underlying actions and substituted and corrected certain Defendants. (Dkt. 528, 536.) Defendants again sought dismissal, filing 8 motions to dismiss on October 9, 2023. (Dkt. 568-594.) After another round of briefing, the Court held a four-hour hearing on December 11, 2023. (Minute Entry).

On December 28, 2023, the Court denied Defendants' *omnibus* motion to dismiss and several other motions, while granting in part Defendants' motion to enforce class action waivers. (Dkt. 691.) The Court's order noted that although the Complaint had not definitively alleged a *per se* violation, the Court's analysis at the motion to dismiss stage "only determine[d] whether Plaintiffs had sufficiently alleged their Sherman Act Section 1 claims, not which standard should control following discovery." (Dkt. 690, at 44).

One Defendant, Apartment Income REIT Corp. ("AIR"), had a separate motion to dismiss, premised on their unique contract. (Dkt. 595, 596.) Before the Court ruled on AIR's motion, Plaintiffs settled with AIR. (Dkt. 711, 715.)

Plaintiffs served document and data requests on each Defendant and undertook months of negotiations over scope, custodians, and search methodology. (Counsel Decl. ¶¶ 13-17.) To date, Defendants have produced 14,778,268 documents and 24 terabytes of structured data. (*Id.* ¶¶ 15, 18.) Plaintiffs have noticed over 140 depositions of non-settling Defendants in September and October, with additional depositions planned for November and beyond. (*Id.* ¶ 19.) Additionally, thus far Plaintiffs have negotiated for over 40 depositions collectively from Settling Defendants

and intend to take these depositions. (*Id.* ¶ 20.) Depositions of the 10 Plaintiffs commenced in August and are expected to conclude in October based on the current schedule. (*Id.* ¶ 21.)

### C. Settlement History

On July 28, 2023, the Court appointed the Honorable Layn R. Phillips as the mediator, and on August 4, 2023, the Court appointed Clay Cogman as an additional mediator. (Dkt. 434 & 475.) In order to facilitate early resolution, the mediators held an initial 6-hour mediation on October 24, 2023, in which 28 Defendants participated. (Mediator Decl. ¶ 13.) The mediators continued to provide opportunities for early resolution, holding another multi-party mediation on March 15, 2024 (which lasted for 10 hours and in which 8 Defendants participated), and a third mediation on April 8, 2024 (which was in-person, lasted for 8 hours, and in which 20 Defendants participated). (*Id.* ¶¶ 17, 19-.)

In addition to the group mediations, Plaintiffs have engaged with Defendants in smaller mediation sessions. On January 29, 2025, the mediators hosted an in-person mediation between Plaintiffs and Defendant Simpson which resulted in an agreement-in-principle between the parties. (*Id.* ¶ 21,) On April 30, 2025, the mediators hosted an in-person mediation session between Plaintiffs and Defendants Greystar, ECI, and Bell, which resulted in agreements-in-principle with ECI and Bell and helped continue dialogue with Greystar. (*Id.* ¶ 23.) On July 23, 2025, Mr. Cogman hosted an in-person mediation session between Plaintiffs and Defendant Windsor, which resulted in an agreement-in-principle between the parties. (*Id.* ¶ 24.) The mediators have also facilitated numerous additional communications between the parties, including hundreds of emails, dozens of phone calls, and extended discussions over monetary and non-monetary terms. (*Id.* ¶¶ 9, 25, 27; Counsel Decl. ¶ 25.) Plaintiffs also engaged in direct settlement negotiations with certain other Defendants, most of which occurred after the mediators arranged for discussions to begin. (Counsel Decl. ¶ 26.) These direct negotiations involved Defendants Pinnacle, Prometheus,

Sherman, Lantower, FPI, and Avenue5, among others. (*Id.*) These settlements likewise required Interim Co-Lead Counsel to conduct extensive negotiations with those Defendants via numerous emails, phone calls, and digital meetings to reach agreeable monetary and non-monetary terms. (*Id.*)

### D.    Material Terms and Relief for the Benefit of Settlement Class Members

As the result of these extensive negotiations, Plaintiffs have reached settlements with 27 Defendants for which they seek preliminary approval. Exhibit A to the Counsel Declaration attaches a chart summarizing the monetary and non-monetary components of each of these Settlement Agreements. The total monetary value of the settlements is $141,800,000. With few exceptions, Settling Defendants are many of the smallest Defendants, and many are property managers only. Generally, this means that the volume of commerce—the amount of rent revenue Defendants generated over the class period—impacted by these settlements is small compared to the overall volume of commerce at issue in the case.

Each settlement agreement also includes valuable cooperation and other non-monetary relief. In terms of cooperation, across the 26 settlement agreements, Plaintiffs have obtained agreements from Settling Defendants for: (1) document and data production (including commitments for informal conferences on data issues from most Settling Defendants); (2) numerous 30(b)(1) and 30(b)(6) depositions, which will assist in continuing to develop evidence of a conspiracy as to the remaining defendants; (3) attorney proffers that will, among other things, help prepare for those depositions; (4) assistance in authenticating documents for trial; (5) in-person trial witnesses; and (6) agreements to respond to limited interrogatories. (Counsel Decl. ¶ 35 and Ex. A thereto.)

Each settlement also secures important structural changes. In particular, Settling Defendants have agreed not to provide nonpublic data to RealPage for use in competitor pricing

recommendations and to refrain from using RealPage's RMS that relies on non-public competitor data to make pricing recommendations.[4] This represents a fundamental shift in the multifamily housing industry and will help reverse the type of anticompetitive coordination alleged in the Complaint.

## II. <u>LEGAL STANDARDS</u>

The Sixth Circuit "favor[s] settlement of class actions."[5] Indeed, "'[t]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources.'"[6]

Rule 23(e) requires that a class settlement be "fair, reasonable, and adequate." At the preliminary approval stage, per Rule 23(e)(1), the settling parties must provide the Court with "information sufficient to enable it to determine whether to give notice" of the proposed settlement to the class. Per Rule 23(e)(1)(B), to determine whether preliminary approval is warranted, the Court must find that it will "likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." A settlement should be preliminarily approved if it (1) "'does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment to class representatives or of segments of the class, or excessive compensation for attorneys,'" and (2) "'appears to fall within the range of possible approval.'"[7] As discussed below, Plaintiffs are not seeking to serve notice at this time, but plan separately to file a motion to approve the plan for notice and allocation of settlement funds.

---

[4] Again, for certain Settling Defendants, the individual settlement obligates them to make efforts to alter contract terms with RealPage to achieve these limitations.

[5] *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) ("*UAW*").

[6] *Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019) (quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003)).

[7] *Johnson v. W2007 Grace Acquisition I, Inc.*, 2015 WL 12001268, at *4 (W.D. Tenn. April 30, 2015) (quoting multiple cases).

7

The Court must also evaluate whether the Settlement Class satisfies Rule 23(a) and the relevant provisions of Rule 23(b). Evaluation under Rule 23(a) requires examination of numerosity, commonality, typicality, and adequacy. Rule 23(b)(3), under which Plaintiffs are proceeding, evaluates questions of predominance and superiority. Fed. R. Civ. P. 23(a), (b)(3).

## III.   **THE PLAN FOR NOTICE**

Plaintiffs request that the Court defer formal notice to the Settlement Class and approval of a plan of allocation at this stage. Courts routinely grant such deferrals in large antitrust cases under comparable circumstances.[8] Postponing notice and approval of a plan of allocation will realize three important efficiencies.

First, Plaintiffs' experts are still analyzing more than 24 terabytes of structured data produced by Defendants, which will enable them to calculate alleged overcharges and enable counsel to develop a fair, reasonable, and equitable allocation plan. (Counsel Decl. ¶ 39.)

Second, the data that Plaintiffs' experts are currently processing and analyzing contains the names and contact information of Settlement Class members from RealPage RMS databases. (Counsel Decl. ¶ 40.) Deferring notice until Plaintiffs' experts have completed their analysis will eliminate duplicative efforts by Angeion to process and clean this massive dataset for purposes of extracting class member contact information for notice. (Admin. Decl. ¶ 32.)

---

[8] *See, e.g., Contant v. Bank of Am. Corp.*, 2019 WL 12276060 (S.D.N.Y. July 29, 2019) (granting preliminary approval of settlement agreement while deferring notice and plan of allocation to allow "additional time for Plaintiffs to obtain Settlement Class member identifying information."); *Albert v. Global Tel*Link Corp.*, 2024 WL 4644631 (D. Md. Oct. 31, 2024) (granting preliminary approval of settlement agreements, certifying settlement class, and finding that cost of class notice warranted deferred until a later time); *In re Aftermarket Filters Antitrust Litig.*, No. 1:08-cv-04883, Preliminary Approval Order (Dkt. 885) at p. 5 (N.D. Ill. Feb. 16, 2012) (same); *In re New Jersey Tax Sales Antitrust Litig.*, No. 3:12-cv-01893, Order (Dkt. 276) at ¶ 7 (D.N.J. Aug. 13, 2013) (granting preliminary approval of settlement and finding that cost of class notice warranted deferral); *In re Broiler Chicken Antitrust Litig.*, 1:16-cv-08637 (TMD), Dkt. 462, 3696, 4113, 5234 (N.D. Ill. Dec. 02, 2021) (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015) (same).

Third, Plaintiffs estimate that the Settlement Class includes millions of individuals. (Counsel Decl. ¶ 41.) The expense associated with notifying such a large number of Settlement Class members will be substantial; using the assumptions provided by Interim Counsel, Angeion estimates that providing notice will cost upwards of $1,000,000.00, depending on the number of notices sent via email versus U.S. mail. (Admin. Decl. ¶¶ 14 n.5, 34.) Deferring notice will help minimize the frequency of these expenses and maximize the fund available for Settlement Class Members, especially at this time when Plaintiffs continue to engage in productive settlement discussions with other Defendants. These same considerations have persuaded other courts to defer notice in partial settlements of large, complex antitrust cases.[9]

Thus, Plaintiffs propose to present the Court at a later date a notice plan for these settlements—as well as any future settlements—that complies with Rule 23(c)(2)(B) and provides constitutionally adequate and reasonable notice to all Settlement Class members based on RMS transaction data listing those impacted by the alleged conspiracy. Plaintiffs propose to update the Court on their progress in preparing for notice and formulating the allocation plan through their regular settlement reports to the Court.

## IV. THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE, MEET THE RULE 23(e) FACTORS, AND WILL LIKELY EARN FINAL APPROVAL

Rule 23(e)(2) sets forth several factors the Court must consider in determining whether a settlement is fair, reasonable, and adequate:

---

[9] *See, e.g., In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Broiler Chicken Antitrust Litig.*, 1:16-cv-08637 (TMD), Dkt. 4113 (N.D. Ill. Dec. 18, 2020) ("[I]t would be more efficient and economical to defer the notice and claims process until a later time."); *In re New Jersey Tax Sales Antitrust Litig.*, No. 3:12-cv-01893, Order (Dkt. 276, ¶ 7) at ¶ 7 (D.N.J. Aug. 13, 2013) ("[I]n light of the costs of notice, and the mutual agreement of the parties, notice shall be deferred until a future date pursuant to a subsequent motion to be filed with this Court.").

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
    (i) the costs, risks, and delay of trial and appeal;
    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
    (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.[10]

The 2018 Advisory Committee Notes make clear, however, that these factors do not displace the "lists of factors" courts have traditionally applied to assess proposed class settlements. While overlapping with many the Rule 23(e) factors, in the Sixth Circuit, these traditional factors include:

(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.[11]

However, a court is not bound to consider all these final approval factors at preliminary approval.[12]

Application of these factors demonstrates that the settlements are fair, reasonable, and adequate, as well as in the best interests of the Settlement Class, warranting preliminary approval.

### A.  Rule 23(e)(2)(A): Plaintiffs and Interim Counsel Have Adequately Represented the Settlement Class

Plaintiffs and Interim Counsel meet the requirement to "adequately represent[ ] the class" under Rule 23(e)(2)(A). This strongly supports preliminary approval of the settlements. In addition, Plaintiffs and Interim Counsel believe the settlement results are outstanding and are in

---

[10] Fed. R. Civ. P. 23(e)(2)(A)-(D).
[11] *Day v. AMC Corp.*, 2019 WL 3977253, at *5 (E.D. Ky. July 26, 2019) (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009)).
[12] *Kizer v. Summit Partners, L.P.*, 2012 WL 1598066, at *1 (E.D. Tenn. May 7, 2012); *cf. Garner Props. & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 621 (E.D. Mich. Jan. 17, 2020) (observing that while factors vary, "it is clear the bar is lower for preliminary approval than it is for final approval").

the best interest of the Settlement Class (Counsel Decl. ¶ 36), thereby satisfying the fifth traditional factor, which considers "the opinions of class counsel and class representatives."[13]

**Plaintiffs**: Plaintiffs have been actively engaged throughout every phase of the litigation, providing invaluable assistance to counsel. They have diligently responded to multiple rounds of comprehensive written discovery, including extensive document collection and production as well as detailed interrogatory responses. Several Plaintiffs have already completed their depositions, with all remaining depositions scheduled. Critically, before agreeing to any settlement, each Plaintiff was personally consulted by counsel and provided authority to enter into all of the settlements now before the Court. (Counsel Decl. ¶ 31.) They remain committed to pursuing the best interests of all class members. Accordingly, they are adequate representatives, and Plaintiffs request that the Court formally appoint them as Settlement Class Representatives.

**Counsel**: Interim Counsel are qualified, experienced, and have shown their ability to conduct the case effectively and efficiently for the proposed Class. This Court has previously evaluated and confirmed the qualifications of Interim Counsel through multiple appointments under Rule 23(g)(3).[14] Interim Counsel's recent application for re-appointment details the extraordinary amount of work that they have performed as to discovery and settlement. (Dkt. 1231-1.)[15] Interim Counsel, together with Liaison Counsel and Plaintiffs' Steering Committee Counsel, have committed substantial resources to prosecuting this case and securing over $141,000,000 in

---

[13] *Day*, 2019 WL 3977253, at *5.
[14] *See* Dkt. 257, 258 (applications seeking appointment); 278 (Order); 923 (report seeking re-appointment); 1068 (Order); 1231-1 (report seeking re-appointment).
[15] *See also* Dkt. 1213 at 2 ("[T]here is no doubt Plaintiffs have been working diligently.").

settlements now before the Court for preliminary approval.[16] As the re-appointment submission reinforces, Interim Counsel remain committed to vigorously representing the class.

### B.    Rule 23(e)(2)(B): The Settlements Resulted from Arm's-Length Negotiations

"Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary."[17] Here, the settlements bear all the hallmarks of a hard-fought, non-collusive negotiations led by capable counsel and assisted by nationally recognized mediators.

A majority of settlements were reached with the assistance of the experienced mediators appointed by this Court. (Dkt. 434 (appointment).) As detailed by Judge Phillips in his Declaration, these settlements resulted from extensive, good-faith, arm's length discussions among all parties and Phillips ADR. (Mediator Decl. ¶ 8.)[18] While a limited number of settlements were finalized without direct mediator involvement, almost every Defendant that ultimately settled initially engaged through the Court-appointed mediators. (Counsel Decl. ¶ 28; *see* Mediator Decl. ¶ 25.) Even when settlements proceeded independently, the mediators remained informed of the negotiations and frequently served as intermediaries for term sheets and final agreements. (Counsel Decl. ¶ 27; Mediator Decl. ¶ 25.) Like the negotiations involving Phillips ADR, these discussions were conducted at arm's length with Interim Counsel's rigorous attention to class interests. (Counsel Decl. ¶ 27.) Throughout all negotiations, Interim Counsel relied extensively on economic

---

[16] Dkt. 1231-1 (application for re-appointment, documenting substantial common benefit expenses and common benefit work invested in the case to date); *see also* Counsel Decl. ¶ 6.

[17] *See Peck v. Air Evac EMS, Inc.*, 2019 WL 3219150, at *8 (E.D. Ky. July 17, 2019) (quoting *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010)).

[18] *See Applegate-Walton v. Olan Mills, Inc.*, 2010 U.S. Dist. LEXIS 77965, at *5 (M.D. Tenn. Aug. 2, 2010) (there was no risk of fraud or collusion where the settlement was "the result of intensive, arms-length negotiations, including mediation with an experienced third-party neutral"); *Peck*, 2019 WL 3219150, at *7 (no risk of collusion where the "parties engaged in months of settlement negotiations, discussed the strengths and weaknesses of their claims and defenses, and engaged a well-versed mediator in determining the terms of the settlement"); 2018 Advisory Committee Note (use of a neutral mediator should be considered in determining "whether [negotiations] were conducted in a manner that would protect and further the class interests").

analysis and comprehensive document review to thoroughly assess the strengths and weaknesses of their claims against each Settling Defendant, ensuring every settlement agreement was entered into with a well-founded, good faith basis for acceptance. (Counsel Decl. ¶ 29.)

### C. Rule 23(e)(2)(C): The Relief Provided to the Settlement Class Is More Than Adequate, Taking into Account the Rule 23(e)(2)(C) Factors[19]

#### 1. The Costs, Risks, and Delay of Trial and Appeal

The complexity, cost, and duration of ongoing litigation are significant factors in evaluating settlement fairness, as settlements should reflect a compromise that accounts for the risks, expenses, and delays of continued litigation.[20] "This is especially true of . . . class action litigation, which is unpredictable."[21] Courts favor early class settlements because they enable class members to obtain recovery without unnecessary delay while conserving judicial resources.[22]

Plaintiffs maintain strong confidence in the merits of their case and believe they would ultimately prevail if this case continues to trial. The Court's denial of Defendants' motions to dismiss on key claims validates the viability of Plaintiffs' core legal theories. (*See generally* Dkt. 690). However, protracted litigation entails substantial costs, delays, and inherent risks that must be carefully weighed against the certainty of recovery through settlement. Even with a strong case, Plaintiffs must still successfully navigate the demanding requirements of class certification,

---

[19] Regarding Rule 23(e)(2)(C)(iii), Interim Co-Lead Counsel intend to request attorney's fees and reimbursement of litigation expenses when they move for approval of notice and plan of allocation. Counsel recognizes that any such request for fees "must be reasonable under the circumstances." *Helms v. Morton Buildings, Inc.*, 2020 WL 13468848, at *1 (M.D. Tenn. Apr. 15, 2020) (citing *Moulton v. U.S. Stell Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)). Regarding Rule 23(e)(2)(C)(iv), there are no agreements, other than the settlement agreements, that need to be disclosed.

[20] *In re Skelaxin Metaxalone Antitrust Litig.*, 2015 WL 13650515, at *2 (E.D. Tenn. Jan. 16, 2015).

[21] *Id.* at *2.

[22] *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) ("By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before over-burdened courts, and to the citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute.").

13

complete extensive and costly discovery, survive summary judgment motions, and ultimately convince a jury of their claims—each presenting substantial risks and expenses. The transition from the favorable pleading standard at the motion to dismiss stage to the proof requirements of later litigation stages creates heightened challenges, as Plaintiffs must move beyond plausible allegations to evidence sufficient to withstand summary judgment and persuade a jury.

For example, proving a conspiracy presents fundamental evidentiary challenges. Antitrust conspiracies typically leave little publicly available evidence and require demonstrating an actual agreement rather than mere parallel conduct. This often is proven through circumstantial evidence to show a meeting of the minds and conscious commitment to restrain trade. Proving an unreasonable restraint of trade under Sherman Act Section 1 also presents complex analytical challenges, particularly if the Court ultimately decides to apply the rule of reason analysis rather than finding *per se* illegality.[23] Even if Plaintiffs successfully navigate class certification, survive summary judgment, and prevail at trial, the complex and evolving nature of antitrust law in the context of algorithmic pricing software creates substantial appellate risks that could undermine even successful trial outcomes. In sum, "[t]here can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result."[24]

Given these substantial litigation risks and the inherent uncertainties in complex antitrust litigation, securing a favorable settlement at this stage presents compelling strategic advantages.

---

[23] Plaintiffs respectfully submit that the *per se* rule should apply for the reasons stated by the court in *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283, 1295-1297 (W.D. Wash. 2024). Plaintiffs will make their submission for the *per se* rule's application at the appropriate time.

[24] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1333 (7th Cir. 1986) ("Antitrust cases are notoriously extended.").

14

Settling with this subset of Defendants provides immediate, concrete benefits: it guarantees meaningful compensation for Settlement Class members without further delay or risk, eliminates substantial ongoing litigation costs for all parties, reduces the complexity and duration of proceedings against the remaining Defendants, and preserves valuable judicial resources by streamlining the remaining case. This approach allows Plaintiffs to secure definitive recovery while maintaining their strong position against the non-settling defendants.

Accordingly, the "costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), strongly support preliminary approval.

2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims

The proposed approach to a method of distributing settlement funds will achieve a fair, reasonable, and equitable allocation by leveraging the sophisticated economic analysis currently underway. As discussed above, Plaintiffs' experts are processing over 24 terabytes of structured data to calculate overcharges. The same data analysis that informs damage calculations also provides class member contact information from Defendants' records, minimizing the need for costly and time-consuming efforts to find class members through other means. The ongoing expert analysis lays the necessary groundwork for identifying class members and determining appropriate compensation levels, thus enhancing the quality of eventual relief distribution. Additional details regarding the plan for distributing relief will be provided along with the plan for notice.

**D.     Rule 23(e)(2)(D): The Proposal Treats Class Members Equitably Relative to Each Other**

Consideration under this factor "could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of

relief."[25] Here, the settlement releases apply uniformly to all Settlement Class members and will not affect the apportionment of the relief. Accordingly, this factor favors preliminary approval.

### E.    The Traditional *UAW* Factors Are Satisfied

Of the seven traditional factors, most have already been addressed in connection with the preceding Rule 23(e)(2) analysis: the risk of fraud and collusion is addressed by Section IV.B (Rule 23(e)(2)(B)); the complexity, expense and likely duration of the litigation is addressed by Section IV.C (Rule 23(e)(2)(C)(i)); and the amount of discovery engaged in by the parties and the opinions of class counsel and class representatives is addressed in Section IV.A (Rule 23(e)(2)(A)). The sixth traditional factor, "the reaction of absent class members," is premature at the preliminary approval stage because notice has not yet been issued. This factor will be addressed at final approval.

Finally, there is a strong policy favoring settlement in class actions. "The public interest weighs in favor of resolving matters fairly and expeditiously."[26] And when a "complex and unpredictable" case such as this confronts the courts,[27] "settlement conserves judicial resources."[28]

The settlement agreements are therefore likely to be finally approved.

## V.    <u>CERTIFICATION OF THE SETTLEMENT CLASS IS LIKELY</u>

The Settlement Class consists of:

All persons and entities in the United States and its territories who paid rent on at least one multifamily residential real estate lease directly to any Owner, Managing Defendants, and/or Owner-Operator participating in RealPage's Revenue Management Solutions, including its pricing software and/or lease renewal staggering software programs, or to a

---

[25] Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment*; see also Fitzgerald v. P.L. Mktg.*, *Inc.,* 2020 WL7764969, at *13 (W.D. Tenn. Feb. 13, 2020).
[26] *Peck*, 2019 WL 3219150, at *8.
[27] *See In re Family Dollar Stores, Inc., Pest Infestation Litig.*, 2023 WL 7112838, at *13 (W.D. Tenn. Oct. 27, 2023).
[28] *Does 1-2*, 925 F.3d at 899.

division, subsidiary, predecessor, principal, agent, or affiliate of any such Owner, Managing Defendant, and/or Owner-Operator at any time during the Class Period.[29]

Settlement Class members have rented directly from, or paid rent directly to, the named Defendants, or their divisions, subsidiaries, predecessors, agents, principals, or affiliates, through leases in buildings participating in RealPage RMS. The Class Period begins on October 18, 2018, and ends either with entry of an order granting preliminary approval or execution date.[30] As set forth below, certification of a Settlement Class under Rules 23(a) and (b)(3) is likely.

### A.     The Proposed Class Will Satisfy Rule 23(a)

Certification under Rule 23(a) is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." As demonstrated below, the Settlement Class satisfies each of the Rule 23(a) requirements.

#### 1.     Numerosity—Rule 23(a)(1)

The class must be so numerous as to make joinder of its members "impracticable." Although no magic number meets this requirement, this court has approved classes as low as 40 members,[31] and "[t]he magic number may even be smaller[.]"[32] Based on data received thus far,

---

[29] "Owner," "Managing Defendants," and "Owner Operator" are defined in the Complaint and include Defendants other than RealPage, Thoma Bravo Fund XIII, L.P., Thoma Bravo Fund XIV, L.P., and Thoma Bravo. "RealPage's Revenue Management Products" are synonymous with "RealPage's Revenue Management Solutions," which are defined in the operative Complaint.

[30] For all Settling Defendants except for Apartment Income REIT LLC ("AIR") and Pinnacle Property Management Services, LLC ("Pinnacle"), the Class Period is October 18, 2018 through the date of entry of a Preliminary Approval Order.  For AIR, the Class Period is October 18, 2018 through August 12, 2024. For Pinnacle, the Class Period is October 18, 2018 through August 13, 2024.

[31] *A.M.C. v. Smith*, 620 F. Supp. 713, 732 (M.D. Tenn. 2022).

[32] *Strougo v. Tivity Health, Inc.*, 2023 WL 3873305, at *2 (M.D. Tenn. June 7, 2023).

the Class far exceeds the bare minimum, making joinder impracticable. (*See* Counsel Decl. ¶ 41.) Each Defendant rented to over 40 class members—many at a single building alone (among many).

### 2. Commonality—Rule 23(a)(2)

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." It is well established that the commonality threshold "is not high."[33] Indeed, "[e]ven a single common question will do."[34] Here, Class Members share many common questions of law and fact, including, *inter alia*, whether Defendants engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for multifamily residential units in the United States, and the duration of such conspiracy. (Dkt. 530 at ¶ 684 (detailing common questions of law and fact).)

### 3. Typicality—Rule 23(a)(3)

Rule 23(a)(3)'s typicality requirement is satisfied where, as here, class representatives' "claim[s] arise[] from the same event or practice or course of conduct that gives rise to the claims of other class member."[35] Courts generally find typicality in cases alleging a price-fixing conspiracy.[36] Here, "the claims of [the] Settlement Class are based on the same challenged conduct and same antitrust theories, and the Class Representatives . . . will seek the same overcharge damages [and injunctive relief] as the absent Settlement Class Members."[37]

### 4. Adequacy—Rule 23(a)(4)

Rule 23(a)(4) requires that the court must find that "the representative parties will fairly and adequately protect the interests of the class." This requirement "serves to uncover conflicts of

---

[33] *Bradberry v. John Hancock Mut. Life. Ins. Co.*, 217 F.R.D. 408, 413 (W.D. Tenn. 2003).
[34] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (cleaned up); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996).
[35] *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tenn. v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 404 (M.D. Tenn. 2019).
[36] *See, e.g.*, *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 185 (D.N.J. 2003).
[37] *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 333 F.R.D. at 404.

interest between named parties and the class they seek to represent."[38] Courts in this Circuit consider whether the representatives have common interest with the unnamed Class members and that the representatives will "'vigorously prosecute the interests of the class through qualified counsel.'"[39] Courts also evaluate "the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation."[40]

Several courts have noted the similarity between the adequacy analysis of Rule 23(a)(4) and Rule 23(e)(2)(A).[41] Accordingly, for the same reasons that Plaintiffs and Co-Lead Counsel have more than adequately represented the Class under the Rule 23(e)(2)(A), the Rule 23(a)(4) "adequacy" considerations likewise favor certification of the Settlement Class.

### B. The Proposed Class Will Satisfy Rule 23(b)(3)

To satisfy Rule 23(b)(3), Plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The proposed Settlements meet both requirements.

#### 1. Predominance (Rule 23(b)(3))

Predominance is established where a common question "is at the heart of the litigation."[42] To show predominance, "'a plaintiff must establish that issues subject to generalized proof and

---

[38] *Amchem*, 521 U.S at 594.

[39] *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (citation omitted).

[40] *Id.* (citation omitted).

[41] *See, e.g., In re BofI Holding, Inc. Securities, Litig.*, 2022 WL 9497235 (S.D. Cal. Oct. 14, 2022) (quoting 4 William B. Rubenstein, *Newberg on Class Actions* § 13:48 (5th ed. 2020)); *Schutter v. Tarena Internat'l, Inc.*, 2024 WL 4118465, at *7 (E.D.N.Y. Sept. 9, 2024); *Robertson v. Trinity Packaging Corp.*, 2025 WL 2224586, at *10 (W.D.N.Y. Aug. 5, 2025).

[42] *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Predominance is "'a test readily met in certain cases alleging . . . violations of the antitrust laws.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 108 (2d Cir. 2007) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *14 (S.D.N.Y. Mar. 28, 2014) ("'where plaintiffs were allegedly aggrieved by a single

applicable to the class as a whole predominate over those issues that are subject to only individualized proof.'"[43] So long as "adjudication of questions of liability common to the class [would] achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate."[44] "'[B]ecause the predominance requirement focuses on whether 'common issues' predominate, its overlap with the commonality inquiry means that courts often undertake the commonality and predominance analyses at the same time.'"[45]

Here, each element of the Plaintiff's antitrust claims would be proven through common evidence.[46] The existence and scope of Defendants' conspiracy to fix rental prices through RealPage's algorithmic pricing software can be shown by common evidence, such as RealPage's internal (and external) communications, client training materials, and deposition testimony of RealPage employees and property management executives. None of this proof will vary across Class Members. Rather, proof of the conspiracy "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members."[47] Further, class-wide impact, causation, and damages can also be shown by common evidence including expert testimony and economic modeling based on RealPage's proprietary rental pricing data and property management companies' lease transaction records and other documentary evidence, which is common to all

___

policy of the defendant[], and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited'") (quoting *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010)).

[43] *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation omitted).
[44] *Id.* (cleaned up).
[45] *In re Fam. Sols. of Ohio, Inc.*, 2022 WL 13915151, at *2 (6th Cir. June 17, 2022) (quoting 7 William B. Rubenstein, *Newberg on Class Actions* § 23:19 (5th ed.) (2021 update)).
[46] *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) (stating that in conspiracy cases, "courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class") (citing cases).
[47] *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002).

20

Settlement Class members and requires no individualized inquiries into each class member's specific rental circumstances.

### 2. Superiority

Rule 23(b)(3) identifies factors relevant to the superiority requirement: "(A) the Class Members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against Class Members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." In assessing superiority, courts "look to the purpose of class action litigation," which is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."[48] But because this is a settlement class, the Court does not need to consider "[w]hether trial would present intractable management problems."[49]

A class action is the superior method for resolving this case. This Settlement Class has millions of members, where common questions of law and of fact predominate. The damages sustained by these Class members range broadly but, in some circumstances, may be very small, further suggesting that a class action is a superior method because bringing such claims individually would not make economic sense. And, to the extent any individual Class member wishes to control the prosecution of their own action, they will have the opportunity to opt-out of the Settlement Class. Further, given the geographic dispersion of class members nationwide, concentrating the litigation is a single forum, rather than spawning multitudes of individual lawsuits and trials, will enhance judicial economy and efficiency.

---

[48] *Hicks*, 965 F.3d at 463–64 (cleaned up).
[49] *Amchem*, 521 U.S. at 620.

### C. Interim Counsel Should be Appointed as Settlement Class Counsel

When certifying a class, the Court "must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Rule 23(g) has factors that courts must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A). Courts may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class…." Fed. R. Civ. P. 23(g)(1)(B).

As discussed in more detail in § IV.A, the Court has appointed and reappointed Interim Counsel based on their qualifications and effective prosecution of this complex litigation. Interim Counsel's exemplary advocacy for the class has resulted in over $141 million in settlements, demonstrating that counsel satisfy all Rule 23(g) factors and should be appointed as Settlement Class Counsel to continue their proven record of zealously representing the Class's interests.

### VI. APPOINTMENT OF A SETTLEMENT ADMINISTRATOR IS APPROPRIATE

Plaintiffs respectfully request that the Court appoint Angeion Group, LLC ("Angeion"), a highly qualified third-party claims and settlement administrator, to serve as the Settlement Administrator. Angeion's qualifications are detailed in the Declaration of Steven Weisbrot. (Admin. Decl. ¶¶ 1-12 and Ex. A.)

Interim Counsel selected Angeion following a thorough competitive bidding process that was designed to ensure selection of the most qualified and cost-effective Settlement Administrator. (Counsel Decl. ¶¶ 43-46.)[50] Several factors distinguished Angeion's proposal during the

---

[50] As detailed in the Counsel Declaration, the process began with soliciting proposals from six established claims administration companies. This broad initial field ensured competitive pricing and allowed evaluation of diverse administrative approaches and capabilities. Following initial proposal review, Interim Counsel conducted virtual interviews with the four top bidders. (*Id.* ¶ 45.)

competitive evaluation. Angeion's team demonstrated exceptional expertise and deep experience in complex class action administration. (*Id.* ¶ 48.) In addition, Angeion employs comprehensive data security measures essential for protecting sensitive class member information throughout the administration process. (*Id.*) Angeion's proposal also includes sophisticated fraud prevention measures protecting settlement fund integrity. (*Id.*) Most significantly, Angeion emerged as the lowest-cost provider among all qualified bidders. This cost advantage persisted even after competing bidders made pricing concessions during negotiations. (*Id.*)

If appointed as Settlement Administrator, Angeion will provide comprehensive settlement administration services essential for successful implementation. Angeion will administer a multi-channel notice program including email, direct mail, and innovative media strategies designed to achieve maximum class member reach. (Admin. Decl. ¶¶ at 18-22.) Angeion will handle claims processing through a sophisticated online platform with fraud detection capabilities and efficient review procedures. (*Id.* ¶¶ 24, 26-30.) Angeion will also manage distribution services offering modern payment options including digital payments and traditional checks, while providing full-service customer support through a call center with multilingual capabilities. (*Id.* ¶¶ 23, 25.)

The appointment of Angeion represents optimal stewardship of settlement funds, achieving the dual objectives of cost minimization and administrative excellence. Angeion's competitive pricing, combined with demonstrated expertise in complex class action administration and innovative notice strategies, provides exceptional value for the Settlement Class. This thorough evaluation process was intended to provide the Court with confidence that this selection balances

---

Two companies advanced to a final evaluation round involving additional detailed questions and additional interviews, ensuring thorough vetting of the top candidates. (*Id.*) This multi-stage evaluation process, which took several months, *id.* ¶ 46, reflects Interim Counsel's diligent stewardship of settlement funds and commitment to selecting the administrator best positioned to serve the Settlement Class's interests most effectively.

all relevant considerations: cost efficiency, technical capabilities, experience with similar matters, and creative problem-solving abilities essential for successful settlement administration.

In addition to seeking appointment of Angeion as Settlement Administrator, the accompanying [Proposed] Preliminary Approval Order seeks authorization to pay claims administration expenses up to $100,000.00, as well as any applicable taxes owing on interest generated by the settlement funds. Payment of administrative costs and taxes from the settlement fund is standard practice in class settlements and allows for streamlined financial management throughout the settlement process. Although formal notice to the Settlement Class is being deferred at this time, certain preparatory work must begin immediately to ensure efficient administration when notice is eventually provided, including establishing the settlement website and developing a portal that will allow class members to pre-register to receive notice when it becomes available. (Admin. Decl. at ¶ 35.) Additionally, Angeion will collaborate with Interim Counsel on developing the notice plan and plan of allocation of the settlement funds. These initial setup costs, along with the eventual expenses of distributing formal notice to the class, are necessary components of settlement administration and are permissible under the terms of the settlement agreements.[51]

## VII. **CONCLUSION**

Accordingly, Plaintiffs respectfully request that the Court enter the [Proposed] Preliminary Approval Order granting preliminary approval of the settlements, finding that the Settlement Class is likely to be certified, appointing Interim Counsel as Settlement Class Counsel; appointing Plaintiffs as Settlement Class Representatives; appointing Angeion as Settlement Administrator; and authorizing payment of administrative expenses and applicable taxes from the settlement

---

[51] *See, e.g.,* Counsel Decl. at Ex. A-1, ¶ 6a ("Other than amounts disbursed for Notice and Administration Expenses, Taxes and Tax Expenses…the remainder of the Settlement Fund shall not be distributed before the Effective Date occurs.").

funds. As requested herein, Plaintiffs seek to defer formal notice to the Settlement Class until such time as a comprehensive notice plan can be presented that encompasses these Settlements along with any additional settlements that may be reached.

The Settlements represent a significant step forward in this litigation, providing for monetary relief to the Settlement Class while advancing the broader goals of deterring anticompetitive conduct in the multifamily housing market. The Court's preliminary approval of these settlements will serve the interests of judicial economy and provide meaningful recovery to potentially millions of affected renters across the United States.

Dated: October 1, 2025

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com
idelisi@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com

Matthew J. Perez
Daniel F. Loud
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Ave., 17th Floor

26

New York, NY 10169
Telephone: (212) 223-6444
matt.perez@scott-scott.com
dloud@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Navy A. Thompson
J. Austin Hurt
Caitlin E. Keiper
Julie Monroney
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
nthompson@robinskaplan.com
ahurt@robinskaplan.com
ckeiper@robinskaplan.com
jmonroney@robinskaplan.com

Laura Song
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Ste. 2601
New York, NY 10019
Minneapolis, MN 55402
Telephone:  (212) 980-7400
lsong@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
1200 17th St NW, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
Joey Bui
Samuel Maida
**HAUSFELD LLP**

27

580 California St, 12th Floor
San Francisco, CA 94104
Tel: (415) 633-1908
gsmith@hausfeld.com
jbui@hausfeld.com
smaida@hausfeld.com

Katie R. Beran
Mindee Reuben
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com
mreuben@hausfeld.com


*Interim Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
1001 G. Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
Jules A. Ross
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com
jross@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Benjamin J. Widlanski
Javier A. Lopez
Robert J. Neary
**KOZYAK TROPIN &
THROCKMORTON LLP**

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Yifan (Kate) Lv
Amelia F. Burroughs
**BURKE LAW**
402 W. Broadway, Suite 1890
San Diego, CA 92101
Telephone: (619) 369-8244
Facsimile (314) 241-3525
cburke@burke.law
klv@burke.law
afb@burke.law

Joseph R. Saveri
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
Nyran Rose Rasche
Kaitlin Naughton
Christopher P. Dolotosky
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
135 S. LaSalle, Suite 3210

2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com
rn@kttlaw.com

Chicago, IL 60603
Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com
nrasch@caffertyclobes.com
knaughton@caffertyclobes.com
cdolotosky@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld